UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JACQUELYN S. PARTLOW,

    Plaintiff,

vs.

Civil Action 2:11-cv-00066
JUDGE EDMUND A. SARGUS, JR.
MAGISTRATE JUDGE E.A. PRESTON DEAVERS

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.

## OPINION AND ORDER

Plaintiff Jacquelyn S. Partlow filed this action on January 21, 2011 seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying her applications for social security disability insurance benefits and supplemental security income. This matter is before the Court for consideration of Plaintiff's Statement of Errors and the Commissioner's Opposition. For the following reasons, this case is **REMANDED** to the Commissioner for further proceedings consistent with this Opinion and Order.[1]

### I. Background

Plaintiff filed her applications for benefits on April 18, 2007, alleging disability since August 10, 2006. Plaintiff alleges disability due to a variety of conditions including arthritis in her back, lumbar disc nuclear dehydration, degeneration of C3-4 disc, anterolisthesis S/I disc degeneration, and neck pain. (R. at 199.) Plaintiff's applications were denied initially and upon

---

[1] In reaching this decision, the Court withdraws the automatic reference of this Social Security case to the Magistrate Judge.

reconsideration. Plaintiff sought a *de novo* hearing before an administrative law judge ("ALJ").

ALJ Earl W. Crump held a video hearing on November 10, 2009, at which Plaintiff, represented by counsel, appeared and testified. ( R. at 29-51.) A vocational expert also appeared and testified. ( R. at 52-58.) On November 25, 2009, the ALJ issued a decision finding that Plaintiff was not disabled. ( R. at 10-17.) The ALJ's decision became final and appealable in November 22, 2010, when the Appeals Council denied Plaintiff's request for review. ( R. at 1-5.) Plaintiff then timely commenced the instant action. Within her Statement of Errors, Plaintiff asserts that the ALJ erred in weighing the opinion of her treating physician and failed to properly consider her fibromyalgia.

## II. Medical Evidence

In August 2006, Plaintiff presented to the Holzer Clinic after falling and injuring her head, neck, and back while working as a housekeeper. (R. at 395.) Examination revealed tenderness near her wrist. (*Id.*) Testing demonstrated a scaphoid cyst on the left wrist and normal cervical spine and lumbar spine series. (R. at 395–99.) A CT scan of Plaintiff's head was normal. (R. at 396.) Although neurovascular exam was normal, Dr. Wayne C. Amendt felt that the pain Plaintiff was having was consistent with a contusion to the ulnar nerve. (R. at 395.) Dr. Amendt diagnosed a contusion of ulnar nerve and possible scaphoid fracture with snuff box (wrist) tenderness. (*Id.*)

Plaintiff also received chiropractic care at the Holzer Clinic for neck, shoulder, back, and leg pain. (R. at 362-93.) Todd S. Rubey, D.C., diagnosed her with lumbar sprain/strain, thoracic sprain/strain, and cervical/strain. (*Id.*)

On September 29, 2006, an MRI of the cervical spine revealed mild narrowing of the left

2

intervertebral neural foramen at the C5-6 level due to spurring, and dehydration of intervertebral discs throughout the cervical spine. (R. at 367.)

On November 2, 2006, chiropractor Walter Baumgartel, D.C., evaluated Plaintiff. (R. at 351–52.) Plaintiff reported having difficulty sleeping because of pain. (R. at 351.) The most intense pain still came from her lower lumbar area and spread to her S/I joints. (*Id.*) Dr. Baumgartel noted that although Plaintiff's entire spinal region was "less tender to touch . . . the trigger points are still very sensitive to pressure." (*Id.*) He specifically noted trigger points and spasms in the rhomboid and longissimus thoracic muscles and trigger points throughout splenius and scalene groups. (*Id.*) His clinical impression was injury to a nerve in Plaintiff's elbow; cervical nerve root compression complicated by moderate degenerative arthritis; nerve disorder in Plaintiff's lower back complicated by moderate degenerative arthritis; muscle twitching secondary to a neck and back sprain/strain; and fasciitis in Plaintiff's muscle groups in the cervical and lumbar spine regions. (R. at 352.) On December 19, 2006, Dr. Baumgartel continued to note trigger points sensitive to pressure. (R. at 345.) Dr. Baumgartel found Plaintiff's progress to be unsatisfactory. (R. at 346.) He stated that efforts needed to be made to investigate the cause of pain with studies of extremities to determine the exact focus of nerve lesions. (*Id.*)

Following her workplace injury, Plaintiff saw family physician, Dawn Murray, D.O. in November 2006. (R. at 284.) Dr. Murray found muscle spasm and tenderness in Plaintiff's lower back, and she prescribed pain medication and muscle relaxant. (*Id.*)

On December 11, 2006, Shailen Mehta, M.D., saw Plaintiff at the Holzer Clinic in regards to her claim for injuries with the Bureau of Workers' Compensation ("BWC"). (R. at

358–61.) Plaintiff's examination was within normal limits except for back and leg pain. (R. at 359.) Dr. Mehta found no objective evidence of any specific focal pathology that would explain the nature of Plaintiff's pain. (*Id.*) Dr. Mehta assessed neck and back strain, a history of previous chronic neck and back pain, and a history of anxiety and stress. (*Id.*) Dr. Mehta recommended that Plaintiff continue to see her chiropractor and do physical therapy. (*Id.*)

A January 3, 2007 MRI of Plaintiff's lumbar spine revealed mild lumbar disc nuclear dehydration changes at the lumbosacral level. (R. at 276.)

In March 2007, Plaintiff saw family physician, Robert Gotfried, D.O. at Family Health Care, Inc. (R. at 283.) Dr. Gotfried diagnosed a lumbosacral strain, referred Plaintiff to physical therapy, and prescribed pain medication and muscle relaxant. (*Id.*)

Also in March 2007, Dr. Baumgartel recommended use of a TENS unit. (R. at 334.) The following month, he reported that Plaintiff's progress was fair and that her neck and shoulder pain had improved. (R. at 332.) He still noted, however, that Plaintiff's lower back remained an issue, with muscle spasms and trigger points. (*Id.*) Dr. Baumgartel opined that Plaintiff was temporarily disabled due to muscle spasm and pain in her lower back region. (*Id.*) By June 2007, Dr. Baumgartel noted a mildly antalgic gait, edema, spasm, and extensive trigger points. (R. at 273-74.) His diagnoses included chronic inflammation, cervical nerve root compression, lumbar plexopathy, and fasciitis of the paraspinal muscle groups in the lumbar spine regions. (*Id.*) He further reported that Plaintiff showed the beginning of degenerative osteoarthritis of the thoracic and lumbar spine, but that the advancement of this condition was primarily complicated by her injury and chronic inflammation. (*Id.*) Dr. Baumgartel opined that Plaintiff had difficulty sitting or standing for extended periods. (R. at 272.) Dr. Baumgartel also reported that therapy

4

was beneficial and gave Plaintiff relief for three days, but then symptoms regressed to uncomfortable levels. (*Id.*)

Also in June 2007, Dr. Baumgartel completed a request for an additional condition to the BWC. (R. at 326.) Dr. Baumgartel stated that Plaintiff's prior lumbar condition and cervical spondylosis, for which she sought chiropractic and physical therapy in 2001 and 2002, complicated the recuperation process for her more recent injury. (R. at 326.) Dr. Baumgartel listed Plaintiff's preexisting conditions as C3/4 anterolisthesis, C5/6 IVF stenosis (narrowing) due to spurring, cervical disc dehydration, L5/S1 disc dehydration, L1-L5 scoliosis, and sacroiliac osteoarthritis. (*Id.*) Accordingly, Dr. Baumgartel concluded that Plaintiff did not experience her August 2006 injury as a normal 36 year-old would experience a simple sprain/strain. (*Id.*) Upon follow-up, Dr. Baumgartel opined that Plaintiff's September 2006 MRI was "ample evidence" that Plaintiff's August 2006 accident aggravated preexisting conditions. (R. at 325.)

On June 25, 2007, state agency physician Paul Heban, M.D., opined that Plaintiff had no severe physical impairment based on his review of the record. (R. at 277.) Diane Manos, M.D., another state agency physician, affirmed Dr. Heban's opinion in November 2007. (R. at 319.)

Dr. Gotfried diagnosed Plaintiff with depression and chronic pain on August 3, 2007. (R. at 282.) On August 23, 2007, Plaintiff presented to Dr. Gotfried complaining that she could not "bear [the] pain in [her] neck & back" and inquired whether she had fibromyalgia like her mother. (R. at 281.) Examination revealed fifteen out of eighteen tender points and axial tenderness. (R. at 281.) On September 6, 2007, Dr. Gotfried diagnosed Plaintiff with fibromyalgia. (R. at 280.) He continued to diagnose fibromyalgia in November and December.

5

(R. at 443–44.)

In October 2007, state agency psychologist Todd Finnerty, Psy.D., opined that Plaintiff had only mild limitations in her activities of daily living; her social functioning; and her ability to maintain concentration, persistence or pace. (R. at 295-308.) Dr. Finnerty concluded that Plaintiff had no severe mental impairment. (R. at 307.)

Consulting physician, Phillip Swedberg, M.D., examined Plaintiff in November 2007. (R. at 309-18.) Plaintiff complained of low back pain, which she attributed to scoliosis. (R. at 314.) Plaintiff also reported that she had fibromyalgia. (*Id.*) Examination revealed that Plaintiff had no muscle atrophy and intact deep tendon reflexes. (R. at 316.) Plaintiff did have difficulty bending forward at the waist. (*Id.*) Dr. Swedberg diagnosed chronic neck and back pain without radiculopathy and a history of fibromyalgia. (R. at 316.) Dr. Swedberg opined that Plaintiff could perform a moderate amount of sitting, ambulating, standing, bending, kneeling, pushing, pulling, lifting, and carrying heavy objects. (*Id.*)

An x-ray of Plaintiff's lumbar spine taken on August 8, 2008, revealed degenerative disc disease. (R. at 416.) An EMG performed on August 29, 2008, revealed neuropathy along the outside of Plaintiff's left leg at the knee, but no evidence of left lumbar radiculopathy. (R. at 418.)

Plaintiff received treatment from Dr. Gotfried and his colleagues throughout 2008. (R. at 429–44.) They continued to treat Plaintiff for fibromyalgia. (*Id.*) Although the records from this period contain some notations of tenderness, they do not appear to reflect further testing of Plaintiff's eighteen focal tender points. (*Id.*)

The record shows that Plaintiff treated with family practice physician, Stacey L. Walter,

6

M.D., from May 12, 2008 until at least October 5, 2009. (R. at 430-34, 441, 446-47.) In December 2008, Dr. Walter assessed Plaintiff with fibromyalgia and anxiety. (R. at 434.) Dr. Walter prescribed Cymbalta in an attempt to improve Plaintiff's fibromyalgia symptoms. (*Id.*) On February 10, 2009, Plaintiff reported that she felt fatigued all of the time. (R. at 433.) Plaintiff complained of memory problems in May and June 2009. (R. at 430-31.) Dr. Walter suspected this was due to depression. (*Id.*)

On September 28, 2009, Plaintiff reported to Dr. Walter that she was feeling more "agitated and irritated." (R. at 447.) With regards to fibromyalgia, Plaintiff reported occasional tingling sensations running from her feet up her thighs. (*Id.*) Dr. Walter opined that Plaintiff's fibromyalgia needed improved control and prescribed additional medication. (*Id.*) Dr. Walter also noted muscle spasms. (*Id.*)

On November 10, 2009, Occupational Therapist Chris Banks, completed a functional capacity evaluation. (R. at 448–56.) According to Mr. Banks, Plaintiff could lift twenty pounds occasionally. (R. at 448.) Mr. Banks noted that Plaintiff would need to alternate more often than normal breaks. (*Id.*) He opined that Plaintiff could stand and walk less than two hours in an eight-hour day with normal breaks. (*Id.*) He reported that Plaintiff would need to sit 60 minutes before needing to stand and stand 60 minutes before needing to sit. (*Id.*) Plaintiff would also need to lie down four to six times in an eight-hour workday. (R. at 449.) Mr. Banks based his assessment on direct observation of Plaintiff's performance during the evaluation as well as Plaintiff's report. (*Id.*) Mr. Banks concluded that Plaintiff could occasionally twist, stoop, bend, crouch, and climb stairs. (*Id.*) She was to avoid even moderate exposure to extreme cold and vibration. (R. at 450.) Mr. Banks stated that Plaintiff should avoid all exposure to hazards

7

because of dizziness. (*Id.*) He stated that in his opinion, Plaintiff possesses a mental impairment that would substantially affect her ability to understand, remember, and carry out simple instructions, make simple work-related decision, respond appropriately to supervisors and co-workers, and deal with changes in a routine work setting. (*Id.*) Dr. Walter signed Mr. Bank's evaluation, stating that she concurred that the responses seemed reasonable based on her knowledge of Plaintiff. (R. at 451.)

### III. Administrative Hearing Testimony

#### A. Plaintiff's Testimony

Plaintiff was thirty-nine years old at the time of the administrative hearing. (R. at 30.) Plaintiff testified that she completed the twelfth grade. (*Id.*) She completed cosmetology training while in high school and previously worked as a licensed cosmetologist. (R. at 30–31.) Plaintiff described a number of her past jobs including her work as a cabin cleaner and waitress. (R. at 32–33.)

Plaintiff testified that she last worked in August of 2006 when her leg fell through the deck of a cabin. (R. at 32.) She reported that since this accident she had chronic pain in her neck, shoulder, and back, as well as pain shooting into her legs. (R. at 39.) She indicated that there were times that her legs went numb and she had fallen. (*Id.*) Plaintiff further testified that she could not bend over to tie her shoes because she became very dizzy and nauseous. (*Id.*) She also stated that she suffers from fibromyalgia which affects her muscles and memory.[2] (R. at 40.) Plaintiff reported that her medications provided partial relief of her pain for a few hours. (R. at

---

[2] During the hearing, counsel for Plaintiff also made clear that Plaintiff's conditions included fibromyalgia. (R. at 28–29.)

8

42–43.) These medications, however, also made her drowsy. (R. at 47.) Plaintiff testified that she was unable to tolerate pain medication that was any stronger than what she was taking at the time of the hearing because it made her very sick. (R. at 40) She noted that the benefits of chiropractic adjustments lasted only half a day. (*Id.*)

Plaintiff testified that, on a typical day, she got up around 6:30 a.m., woke her children, and then sat for fifteen minutes. (R. at 37.) She made breakfast for her children if she felt well. (*Id.*) She took her children to school, came home and laid down for a few hours, then did a load of laundry. (*Id.*) Plaintiff testified that she spent four to five hours each day lying down. (R. at 38.) She noted that she usually had assistance doing housework and did less than one fourth of the housework on her own. (*Id.*) With consistent breaks, Plaintiff was able to perform some cooking, dusting, sweeping, and vacuuming. (R. at 50–51.) She occasionally mowed the lawn, but could not complete the entire yard by herself. (R. at 38.) To pass her free time, she watched television or read a book. (*Id.*) Plaintiff did not visit friends or relatives and did not attend church or any organizational meetings. (*Id.*) She was able to go shopping with her children. (*Id.*)

Plaintiff testified that she walked about a half of a block to a block per day. (R. at 43.) She estimated that she could stand for about an hour at a time. (*Id.*) According to Plaintiff, if she was able to rotate between sitting and standing with breaks during an eight-hour workday, she could stand a total of two hours or less. (R. at 44.) Plaintiff also noted problems with sitting, estimating that she could sit for approximately one hour at a time. (*Id.*) She reported that she had trouble going up and down steps, trouble bending and stooping, and trouble reaching overhead with her left arm. (*Id.*) Plaintiff stated that she would feel comfortable lifting fifteen to

9

twenty pounds on a regular basis. (*Id.*)

## B. Vocational Expert Testimony

The vocational expert, Norman Hooge, Ph.D., classified Plaintiff's past employment. (R. at 54.) According to Dr. Hooge, Plaintiff's past employment fell into a variety of categories including medium unskilled work; light skilled work; and light semi-skilled work. (*Id.*) Dr. Hooge explained that these jobs were all of relatively short duration, and that Plaintiff's earnings records indicate that she has never worked at the substantial gainful activity level on an annualized basis. (*Id.*)

The ALJ asked Dr. Hooge to consider a person of Plaintiff's age, education, and past work experience who was limited to no more than medium work and who would be limited to no more than occasional climbing, balancing, kneeling, crouching and crawling. (R. at 54–55.) Based on this hypothetical, the Dr. Hooge testified that such an individual could work as a food service worker in a hospital setting, with about 1,000 such jobs in the region, a transporter, with about 1,500 jobs regionally, and a cook's helper, with about 800 positions regionally. (R. at 55.)

The ALJ proposed a second hypothetical person who could do no more than light work and who was limited to standing and walking two hours out of eight hour day; sitting for six hours; and no more than occasional climbing, balancing, kneeling, crouching, or crawling. (R. at 56.) Dr. Hooge testified that such an individual could perform work as an office helper and storage facility rental clerk, both with 800 regional jobs. (*Id.*) Dr. Hooge also opined that such a person could perform the work of cubical cashier, with about 1,500 statewide jobs. (R. at 57.)

Dr. Hooge acknowledged that if Plaintiff's testimony was found credible, there would be no jobs available to her due to her pain and inability to complete a full workday and work week.

10

(R. at 57.) Additionally, counsel for Plaintiff asked Dr. Hooge to consider a hypothetical person with the limitations Mr. Bank's assigned. (R. at 58.) Dr. Hooge opined that such limitations would be work preclusive. (*Id.*)

## IV. Administrative Decision

On November 25, 2009, the ALJ issued his decision. (R. at 10-17.) The ALJ found that Plaintiff had the severe impairments of arthritis in her back, chronic back pain, and lumbar disc nuclear dehydration. (R. at 12.) He did not mention fibromyalgia within his severe impairment analysis. (R. at 12–14.) He determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. 404, Supart P, Appendix 1. (R. at 14.) The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform medium work, but could only occasionally climb, balance, kneel, crouch, and crawl. (*Id.*) Although the ALJ did not directly cite to a medical opinion in support of this RFC, he appears to have relied partially on the opinion of Dr. Swedberg. (*See* R. at 14–15.) The ALJ rejected the opinions of Dr. Baumgaertel and Mr. Banks. (R. at 15.) He did not mention Dr. Walter within the decision. Based on Dr. Hooge's testimony, the ALJ concluded that Plaintiff could perform a significant number of jobs in the national economy. (R. at 16–17.) He therefore concluded that Plaintiff was not disabled. (R. at 17.)

## V. Standard of Review

Under the provisions of 42 U.S.C. § 405(g), "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated*

11

*Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)). "Substantial evidence is defined as more than a scintilla of evidence but less than a preponderance . . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

In determining whether substantial evidence supports the Commissioner's decision, the Court must "take into account whatever in the record fairly detracts from its weight." *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (internal quotations omitted). Furthermore, "even if supported by substantial evidence . . . a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007).

## VI. Analysis

In her Statement of Errors, Plaintiff contends that the ALJ erred by (1) failing to appropriately consider Plaintiff's fibromyalgia, and (2) failing to account for the opinion of Plaintiff's treating physician, Dr. Walter. The Court agrees, and finds that both of these errors support remand.

### A. Fibromyalgia

In assessing a claimant's condition and impairments an ALJ has a duty to discuss his or her "findings and conclusions, and the reasons or basis therefor," so that the Court may engage in "effective and meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (internal quotations omitted); *see also Blackburn v. Astrue*, No. 1:09–cv–943, 2011 WL 2940399, at *7 (S.D. Ohio Mar. 2, 2011) ("This court simply cannot uphold [the Commissioner's] decision as supported by substantial evidence based on a silent

12

record.").

At step two of the five-step sequential evaluation process, an ALJ considers whether a claimant has severe impairments.[3] 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The United States Court of Appeals for the Sixth Circuit has described this step as a "*de minimus* hurdle" and noted that "if an impairment has more than a minimal effect on the claimant's ability to do work activities, the ALJ must treat it as severe." *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576–77 (6th Cir. 2009) (internal quotations omitted). Furthermore, when considering a claimant's RFC at step five, an ALJ must consider all of that claimant's impairments, whether severe or not, to determine the most he or she can still do. 20 C.F.R. §§ 404.1545(a), 416.945(a).

Plaintiff maintains that the ALJ failed to properly consider fibromyalgia. "Fibromyalgia . . . is a medical condition marked by 'chronic diffuse widespread aching and stiffness of muscles and soft tissues.'" *Rogers*, 486 F.3d at 244 n.3 (quoting *Stedman's Medical Dictionary for the Health Professions and Nursing* at 541 (5th ed. 2005)). While a diagnosis of fibromyalgia does not necessarily entitle a claimant to a finding of disability, the condition may be severe enough to result in disability. *Compare Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 818 (6th Cir. 1988) (finding disability due to fibromyalgia); *with Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008) (finding substantial evidence that a claimant's fibromyalgia was not severe enough to result in disability).

The Sixth Circuit has recognized that fibromyalgia results in unique challenges in evaluation:

---

[3] The entire five-step analysis is set forth in 20 C.F.R. § 404.1520(a)(4).

13

> [U]nlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs. *See Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988) (per curiam) (noting that objective tests are of little relevance in determining the existence or severity of fibromyalgia); *see also Swain v. Comm'r of Soc. Sec.*, 297 F.Supp.2d 986, 990 (N.D. Ohio 2003) (observing that "[f]ibromyalgia is an 'elusive' and 'mysterious' disease" which causes "severe musculoskeletal pain"). Rather, fibromyalgia patients "manifest normal muscle strength and neurological reactions and have a full range of motion." *Preston*, 854 F.2d at 820. The process of diagnosing fibromyalgia includes (1) the testing of a series of focal points for tenderness and (2) the ruling out of other possible conditions through objective medical and clinical trials. *Id.*; *Swain*, 297 F. Supp.2d at 990.

*Rogers*, 486 F.3d at 243–44. "Since the presence and severity of fibromyalgia cannot be confirmed by diagnostic testing, the physician's opinion must necessarily depend upon an assessment of the patient's subjective complaints." *Swain*, 297 F. Supp. 2d at 990. "This places a premium, therefore, in such cases on the assessment of the claimant's credibility." *Id.*

When the record presents evidence of fibromyalgia, the Sixth Circuit has not hesitated to remand or reverse administrative decisions that fail to consider, or apply incorrect standards to, the condition. *See, e.g., Rogers*, 486 F.3d at 244 (remanding in part because the ALJ "impliedly dismiss[ed] or minimaliz[ed]" the claimant's fibromyalgia); *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 859 (6th Cir. 2011) (finding an ALJ's failure to identify fibromyalgia as a severe impairment, or explain why it was not one, to be a gaping oversight); *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 778 (6th Cir. 2008) ("[T]he ALJ in this case did not discuss, let alone apply, the correct standard for assessing a diagnosis of fibromyalgia in his decision, instead emphasizing and basing his denial of benefits on 'normal' physical findings . . . ."). Likewise, this Court has admonished ALJs for failing to properly address fibromyalgia within their decisions. *See, e.g., Blackburn v. Astrue*, No. 1:09–cv–943, 2011 WL

14

2940399, at *7 (S.D. Ohio Mar. 2, 2011) ("Given the utter absence of any discussion of Plaintiff's fibromyalgia by the ALJ in her written opinion, I conclude that remand is required.") (Report & Recommendation later adopted); *Boston v. Astrue*, No. 1:10–cv–408, 2011 WL 4914759, at *9 (S.D. Ohio Sept. 15, 2011) ("The ALJ's failure to address this evidence, and properly evaluate Plaintiff's fibromyalgia, prevent the Court from engaging in meaningful review of the ALJ's decision.") (Report & Recommendation later adopted).

In this case, the Court finds that the ALJ failed to properly address fibromyalgia. The record evidence clearly puts fibromyalgia at issue in this case. In an August 2007 examination, Dr. Gotfried found that Plaintiff had fifteen out of eighteen tender points. (R. at 281.) Accordingly, in September 2007 he diagnosed Plaintiff with fibromyalgia. (R. at 280.) Notably, even before August 2007, Dr. Baumgartel's examinations had revealed extensive trigger points. (*See, e.g.*, R. at 273, 351.) Other doctors, including Dr. Walter, also diagnosed and treated Plaintiff for fibromyalgia. (*See, e.g.*, R. at 433–38.) In September 2009, Dr. Walter opined that Plaintiff's fibromyalgia needed improved control. (R. at 447.) Furthermore, at the administrative hearing, both Plaintiff and her attorney stressed that fibromyalgia was a component of her claim.

Despite this evidence, however, the ALJ failed to consider fibromyalgia within his written decision. At step two of the evaluation process, the ALJ did not find fibromyalgia to be a severe impairment nor did he discuss why it was not a severe impairment. Furthermore, in assessing Plaintiff's RFC, the ALJ's analysis fails to indicate that he considered fibromyalgia in assessing Plaintiff's limitations or credibility. In total, the ALJ's decision mentioned fibromyalgia once, a passing acknowledgment that Plaintiff had testified to having the condition.

15

Defendant essentially maintains that it was harmless for the ALJ to omit discussion of fibromyalgia because there was no evidence that fibromyalgia limited Plaintiff's ability to work. The Court, however, is unwilling to find the ALJ's error harmless in this case. As detailed further below, Dr. Walter, one of the physicians who treated Plaintiff for fibromyalgia, issued a statement finding that the significant limitations Mr. Banks assigned were reasonable based on her treatment of Plaintiff. The ALJ rejected these limitations based in large part on a lack of medical signs and findings. Such reasoning, however, would not be sufficient for disregarding Plaintiff's fibromyalgia given the general lack of objective signs. Relatedly, because of the nature of the condition, fibromyalgia places a premium on the evaluation of credibility. Although the ALJ's analysis was scarce on the issue, the ALJ appears to conclude that Plaintiff was not entirely credible based on a lack of objective signs. Once again, to the extent Plaintiff suffers from fibromyalgia, such reasoning is not adequate to discount Plaintiff's credibility.

Ultimately, given the record evidence and circumstances of this case, the ALJ's failure to discuss fibromyalgia within his written opinion leaves the Court unable to conduct a meaningful review. It is unclear to the Court whether the ALJ discredited evidence of fibromyalgia or simply ignored it. *See Boston*, 2011 WL 4914759 at *9 ("When an ALJ fails to mention relevant evidence in his or her decision, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.") (internal quotations omitted). Furthermore, the ALJ's failure to address fibromyalgia casts doubt on his analysis with regards to Plaintiff's credibility as well as the weighing of the opinion evidence.

## B. Treating Physician Opinion

Even assuming that the ALJ properly considered fibromyalgia, Plaintiff maintains that the

16

ALJ failed to properly consider the opinion of Dr. Walter. The Court agrees that the ALJ also committed error in this regard.

In deciding whether a claimant is disabled, an ALJ must consider all medical opinions along with any other relevant evidence. 20 C.F.R. §§ 404.1527(b), 416.927(b). When evaluating medical opinions, the ALJ will generally give more weight to treating sources than other types of sources. 20 C.F.R. §§ 404.1527(d), 416.927(d). A treating source is a "medical source who has had an ongoing relationship with the claimant." *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 442 (6th Cir. 2010) (citing 20 C.F.R. § 404.1502). If a treating source's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" the ALJ must give the opinion controlling weight. 20 C.F.R. §§ 404.1527(d), 416.927(d). If a treating source's opinion is not entitled to controlling weight, the ALJ must apply the various factors outlined in the regulations to determine what weight to give the treating source. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Finally, the regulations require an ALJ to "always give good reasons" regarding the weight he or she gave to a treating source's opinion. 20 C.F.R. §§ 404.1527(d), 416.927(d); *see also Wilson*, 378 F.3d at 544 (explaining that the good-reason requirement allows claimants to understand the administrative decision and assures that ALJs conduct meaningful review of treating physician opinions).

In this case, the ALJ failed to give good reasons as to how he weighed the opinion of Dr. Walter. Mr. Banks performed a physical capacity evaluation, assinging significant limitation to Plaintiff. (R. at 448–56.) Dr. Walter signed this evaluation. (R. at 451.) Dr. Walter noted that the limitations Mr. Banks assigned were reasonable based on her knowledge of Plaintiff. Within

17

his decision, ALJ rejected the limitations Mr. Banks set forth, and ultimately assigned Plaintiff a less-restrictive RFC. The ALJ, however, failed to acknowledge in any manner that Dr. Walter had concurred with, or at least added support to, Mr. Banks' opinion. Furthermore, the ALJ did not separately evaluate Dr. Walter's opinion.

Defendant attempts to justify the ALJ's omission in a number of ways. First, Defendant contends that Dr. Walter's statement was not truly an opinion because she did not actually adopt the limitations in question, but only concluded that the limitations Mr. Banks assigned were reasonable. This contention is unpersuasive. According to the regulations, "[m]edical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including . . . your physical or mental restrictions." 20 C.F.R. §§ 404.1527(a), 416.927(a). Here, Dr. Walter issued a statement reflecting that in her judgment the limitations Mr. Banks assigned were reasonable. Certainly this statement is relevant to the nature and severity of Plaintiff's limitations. Although the phrasing of Dr. Walter's statement might ultimately affect the weight it is due, her notation still falls within the relatively broad confines of a medical opinion under 20 C.F.R. §§ 404.1527(a), 416.927(a) and is entitled to at least some consideration.

Second, Defendant implies that Dr. Walter might not qualify as a treating physician. Once again, the Court disagrees. The record reflects that Dr Walter treated Plaintiff over an extended period of time, from May 2008 to October 2009, examining Plaintiff at least eight times during this period including six times in 2009. (*See* R. at 430-34, 441, 446-47.) As Dr. Walter gave her opinion in November 2009, the Court finds the frequency of visitation and treatment sufficient to trigger the procedural protections of the treating physician rule in this case.

18

Furthermore, it appears from the sources of the record evidence submitted, that Dr. Walter was treating Plaintiff in conjunction with other physicians at Family Health Care Inc. including Dr. Gotfried.[4] *See Puckett v. Comm'r of Soc. Sec.*, No. 1:10–cv–528, 2011 WL 4366665, at *3 (S.D. Ohio Sept. 9, 2011) (finding that a doctor was a treating physician in part because the doctor worked for the claimant's treatment facility and had access to the claimant's progress notes).

Finally, the ALJ's failure to address Dr. Walter's opinion is not harmless error. *See Wilson*, 378 F.3d at 447–48 (recognizing certain situations, such as when the Commissioner indirectly attacks the treating physician opinion, where failure to give good reasons might be harmless error). Here, Dr. Walter's opinion provided support for the opinions of Mr. Ball. The ALJ's decision does provide reasons for rejecting the limitations Mr. Ball assigned. Nevertheless, the ALJ's first stated reason for rejecting these limitations, that Mr. Ball was not an acceptable medical source, would not apply to Dr. Walter. (*See* R. at 15.) Furthermore, as detailed above, to the extent the ALJ rejected these limitations as inconsistent with the medical signs and findings, this reason does not appear to account for Dr. Walter's diagnosis of fibromyalgia. Finally, and perhaps most importantly, from the current record it is impossible to tell whether the ALJ implicitly rejected Dr. Walter's opinion or simply overlooked the fact that a medical source had supported Mr. Ball's limitations. Accordingly, the Court cannot conclude that the ALJ met the goals of the good-reason requirement by indirectly attacking Dr. Walter's opinion.[5]

---

[4] The record reflects that Dr. Walters submitted medical examination records of Dr. Gotfried, another physician, and herself. (*See* R. at 429–44.)

[5] The Sixth Circuit has also recognized that harmless error might occur if the opinion in question is patently deficient or if the Commissioner ultimately makes findings consistent with the opinion. *Wilson*, 378 F.3d at 447. Neither of these scenarios apply to this case.

19

### C. Remand

Within her statement of errors Plaintiff seeks an award of benefits or, in the alternative, remand for further consideration. Here, remand for further consideration is the appropriate course. As the ALJ's errors were largely procedural in nature, the Court cannot conclude based on the current record that all factual issues have been resolved. *See White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 790 (6th Cir. 2009) ("[T]he court can reverse the decision and immediately award benefits only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits.") (internal quotations omitted). Additionally, to the extent Plaintiff seeks attorney's fees pursuant to the Equal Access to Justice Act, Plaintiff may file a separate motion so that the Court may consider briefing on the issue.

### VI. Conclusion

For the foregoing reasons, this case is **REMANDED** to the Commissioner of Social Security for further consideration.

**IT IS SO ORDERED.**

3-20-2012
**DATED**

**EDMUND A. SARGUS, JR.
UNITED STATES DISTRICT JUDGE**

20